RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0232p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 25-3245

TIANNA BARBER,

*Defendant-Appellant*.

Appeal from the United States District Court for the Northern District of Ohio at Toledo.
No. 3:22-cr-00511-1—Jeffrey James Helmick, District Judge.

Argued: July 22, 2026

Decided and Filed: August 14, 2026

Before: BOGGS, KETHLEDGE, and THAPAR, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Benton C. Martin, OFFICE OF THE FEDERAL COMMUNITY DEFENDER, Detroit, Michigan, for Appellant. Daniel R. Ranke, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Benton C. Martin, OFFICE OF THE FEDERAL COMMUNITY DEFENDER, Detroit, Michigan, for Appellant. Daniel R. Ranke, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

The court delivered a PER CURIAM opinion. THAPAR, J. (pp. 10–13), delivered a separate opinion concurring in part and concurring in the judgment.

—————————

**OPINION**

—————————

PER CURIAM.    Tianna Barber participated in a large-scale drug conspiracy that trafficked heroin, fentanyl, cocaine, and methamphetamine obtained from a Mexican cartel.  As a result, a jury convicted her of various drug offenses.  She now challenges both her conviction and sentence, arguing that the district court erred in admitting certain evidence at trial and in calculating her Sentencing Guidelines range.  But the district court did neither, so we affirm.

I.

A few years ago, federal agents learned that a drug courier was bringing kilograms of cocaine, heroin, and fentanyl to Toledo, Ohio, on behalf of a Mexican cartel.  When that courier arrived in Toledo, he met with Derrick Murphy.  So agents began investigating Murphy and his associates.  They conducted surveillance, carried out controlled drug buys, and wiretapped Murphy's phone.  And through that investigation, agents learned about Tianna Barber.

Barber and Murphy weren't just "best friend[s]."  R. 382, Pg. ID 4632.  They were also co-conspirators.  After Murphy was arrested on state charges, Barber became his intermediary so that he could communicate from inside jail with members of the conspiracy on the outside.  She negotiated drug prices on Murphy's behalf.  She let Murphy store kilograms of drugs at her house.  She collected drug proceeds for Murphy and flew to Texas several times to deliver that money.  She purchased a semiautomatic rifle, which she later gave to Murphy.  And she sold drugs, including methamphetamine and fentanyl disguised as prescription painkiller pills.

As a result, a federal grand jury charged Barber with conspiring to possess controlled substances with the intent to distribute them, distributing methamphetamine, possessing heroin with the intent to distribute it, and two counts of using a telephone to facilitate a drug felony.

At trial, a federal agent testified about his interpretation of certain jail calls in which Murphy and Barber discussed drug-trafficking activity.  The government also introduced a video recording of a controlled drug buy involving Murphy, Barber, and a confidential source.  Plus, a

cooperating witness testified about bringing drugs to Barber's home on Murphy's behalf and traveling with Barber to deliver drug proceeds.

Based on all this evidence (and more), the jury convicted Barber of the conspiracy, distribution, and possession counts and one count of using a telephone to facilitate a drug felony. It found that she conspired to distribute less than 100 grams of heroin, less than 500 grams of cocaine, less than 40 grams of fentanyl, and less than 50 grams but more than 5 grams of methamphetamine. The jury also concluded that Barber distributed less than 50 grams but more than 5 grams of methamphetamine. Finally, the jury acquitted Barber of the other count of using a telephone to facilitate a drug felony.

The U.S. Probation Office then prepared a presentence report (PSR), which calculated the quantity of drugs attributable to Barber. Specifically, the Probation Office determined that Barber's crimes involved 7,100.18 grams of cocaine; 27.1 grams of pure methamphetamine; 1,360 grams of mixtures containing methamphetamine; and 1,034.29 grams of heroin. Barber objected that these calculations depended on the testimony of a trial witness who wasn't credible. She also argued that sentencing her based on those drug quantities would "invade[]" "the province of the jury" because the jury didn't find that the conspiracy involved such high drug amounts. R. 342, Pg. ID 3141. At sentencing, Barber reiterated these objections but disclaimed any argument that the PSR's calculations "involve[d] acquitted conduct." R. 386, Pg. ID 4995.

The district court overruled Barber's objections and adopted the PSR's drug-quantity findings. Based on those drug amounts, the court calculated a Guidelines range of 262 to 327 months of imprisonment. The court then imposed a below-Guidelines sentence of 150 months of imprisonment. Barber timely appealed.

II.

Barber first challenges the district court's evidentiary rulings at trial. She contends that the court erred in permitting a federal agent to interpret recorded jail calls. Barber also argues that playing a video of the controlled drug buy violated her rights under the Sixth Amendment's Confrontation Clause because the confidential source didn't testify at trial.

We ordinarily review a district court's evidentiary rulings for abuse of discretion. *United States v. Page*, 163 F.4th 385, 396 (6th Cir. 2025). But if the defendant didn't raise her specific evidentiary challenge before the district court, we review for plain error. Fed. R. Crim. P. 52(b). To establish plain error, a defendant must show that the error was clear or obvious and affected her substantial rights as well as the fairness, integrity, or public reputation of the proceedings. *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc).

A.

Start with Barber's challenge to the agent's testimony about her recorded jail calls with Murphy. She claims that the agent "improperly testified about the meaning of ordinary words and phrases." Appellant's Br. at 18; *see also id.* at 21 (citing *United States v. Glenn*, 146 F.4th 485, 491 (6th Cir. 2025)). But at trial, she objected only on the grounds that the agent was speculating and that the government hadn't laid a proper foundation for his testimony. Because Barber now asserts a new basis to challenge the agent's testimony, we review this argument for plain error. *See United States v. Cox*, 871 F.3d 479, 488 (6th Cir. 2017).

Under Federal Rule of Evidence 702, a witness with "specialized knowledge" who is qualified based on his "knowledge, skill, experience, training, or education" may offer his opinion if it will help the jury understand the evidence or a fact in issue. So we've long permitted law-enforcement officers to testify as expert witnesses and "interpret intercepted conversations that use slang, street language, and the jargon of the illegal drug trade." *United States v. Kilpatrick*, 798 F.3d 365, 379 (6th Cir. 2015) (quotation omitted). But law-enforcement officers testifying as experts can't "interpret[] ordinary English language to effectively tell the jury the government's theory of the case." *Glenn*, 146 F.4th at 491. The federal agent here complied with these restrictions and properly applied his experience to interpret the recorded jail calls.

For starters, the agent was qualified to translate the coded language in Barber's calls with Murphy. He served for seven years as a local police officer investigating drug traffickers. He then worked for the FBI for 28 years, spending about 20 of those years on a drug task force in Toledo. During this time, he received extensive training on narcotics investigations, worked

closely with informants in drug conspiracies, conducted surveillance of drug traffickers, and listened to "[h]undreds of hours" of recorded jail calls. R. 376, Pg. ID 3720. In doing so, the agent learned how inmates "try to be tricky with how they talk and use different words" and became familiar with their "slang" and "code words." *Id.* at 3720–21. The agent's specialized knowledge thus qualified him to interpret the coded language in Barber's communications. *See United States v. Maya*, 966 F.3d 493, 505 (6th Cir. 2020).

The agent then properly applied his experience to explain the slang used in the recorded jail calls. For example, he testified that the word "brick" is "slang . . . for [a] kilogram of drugs." R. 376, Pg. ID 3735. So when Barber mentioned that "bricks at Home Depot" cost "32 cents," the agent clarified that she was likely referring to a price of $32,000 for a kilogram of drugs, which was the going rate for fentanyl at the time. *Id.* at 3743–44. Similarly, he explained that "paint" was slang for fentanyl. R. 377, Pg. ID 3887–88. And he told the jury that construction "materials" was a code word for "narcotics." *Id.* at 3781. Finally, when Murphy stated, "If you can't do this construction job tomorrow, a Saturday, all in one day, then it's a vacation," the agent translated that coded language to mean, "If the boss can't get the money by tomorrow, he's not going to bring any narcotics into town." *Id.* at 3783. Through this testimony, the agent properly explained the drug traffickers' jargon.

In response, Barber points to our decision in *Glenn*, which held that an agent impermissibly interpreted text messages between a drug trafficker and his customer. 146 F.4th at 491. But the defendant's communications in that case "were nearly devoid of . . . specialized language." *Id.* So the jury was "just as competent" to understand the drug trafficker's use of "common words and phrases." *Id.* In contrast, Barber and her co-conspirators regularly relied on coded language that was outside of a typical juror's knowledge. So the federal agent could explain that unfamiliar language to the jury.

Granted, some of the agent's testimony is a closer call. For instance, when Barber said that she had "half of that," the agent testified, "She's talking about having half of the money that [Murphy] needs to get to the boss." R. 377, Pg. ID 3788. And when Murphy referred to a person as "what's his name," the agent explained, "[H]e obviously doesn't want to say the name of the person." *Id.* at 3809. In addition to these recorded jail calls, the agent interpreted a

conversation between Barber and a confidential source during a controlled drug buy. After Barber joked that the source looked like Billy Ray Cyrus, the source responded, "[B]etter Billy Ray than them people." *Id.* at 3886. The agent then testified that "them people" referred to the "police." *Id.* at 3887.

At first glance, these three statements seem to involve only "common words and phrases." *Glenn*, 146 F.4th at 491. Yet the agent also suggested that these interpretations were based on his law-enforcement "training and experience." R. 377, Pg. ID 3887. Had Barber objected at trial, the government could have asked more questions to lay a better foundation for the agent's responses, and the agent could have explained the basis for his interpretations. For example, on an occasion when Barber objected that the agent was speculating, the district court sustained the objection, and the government asked further questions to address that concern. But in this instance, she didn't object that the agent was simply explaining common words and phrases. So the government didn't follow up about that, and we don't know for sure whether the agent was merely interpreting ordinary English or applying his specialized knowledge. That means any errors in admitting this testimony aren't clear or obvious.

Even if the errors were clear or obvious, they still wouldn't warrant reversal because they didn't affect Barber's substantial rights. To affect Barber's substantial rights, there must be a "reasonable possibility" that the agent's three statements "swayed the jury such that their admission warrants reversal of [Barber's] conviction." *United States v. Warman*, 578 F.3d 320, 347 (6th Cir. 2009). But there was ample evidence of Barber's guilt, including the other recorded jail calls discussing drug trafficking and the controlled sale of methamphetamine to a confidential source. Plus, a cooperating witness testified that he saw drugs at Barber's home, took drugs to her house on Murphy's behalf, and traveled with Barber several times to deliver drug proceeds. The government also introduced evidence that Barber brought a heroin sample to a cooperating source and sold fentanyl pills. So there's no reasonable probability that three snippets of testimony during Barber's six-day trial altered the verdict.

Barber once again falls back on *Glenn* because, in that case, we found that the agent's improper testimony may have swayed the jury and thus required a new trial. 146 F.4th at 491. But in *Glenn*, the agent's impermissible interpretation of ordinary language "made up virtually

all of the evidence" on a key issue. *Id.* In contrast, a mountain of other evidence established Barber's guilt. And that critical distinction alone means that reversal isn't warranted here.

B.

Next, Barber argues that the district court erred by admitting a video of a controlled drug buy involving a confidential source. Because that source didn't testify at trial, Barber contends that the admission of his statements in the video violated her rights under the Confrontation Clause. Yet Barber didn't object to the admission of the video before the district court. So we review this new argument for plain error. Barber can't meet that demanding standard.

The Confrontation Clause guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. That means the government generally can't introduce the statements of a witness who doesn't testify at trial. *Smith v. Arizona*, 602 U.S. 779, 784 (2024). But that "prohibition applies only to testimonial hearsay." *Id.* (quotation omitted). In other words, if a statement isn't hearsay, then the Confrontation Clause doesn't bar its admission. *Id.* at 785. Because the video recording of the controlled buy didn't include any hearsay, its admission didn't violate the Confrontation Clause.

First off, Barber's and Murphy's statements in the video weren't hearsay. Barber's own out-of-court statements weren't hearsay because she's "an opposing party" to the government, which introduced the video. Fed. R. Evid. 801(d)(2). Nor were Murphy's remarks hearsay, because they were the statements of Barber's "coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). After all, Barber and Murphy were coordinating a methamphetamine deal in the video, and the charged conspiracy centered on distributing narcotics, including methamphetamine.

That leaves the confidential source's statements. His comments weren't hearsay because they weren't offered "to prove the truth of the matter asserted." Fed. R. Evid. 801(c)(2). Instead, they were offered to provide context to Barber's and Murphy's responses. *See United States v. Harrison*, 54 F.4th 884, 887 (6th Cir. 2022). For example, the source asked, "[S]hould I give [Barber] the bread"? R. 377, Pg. ID 3885. That question provided context to Murphy's response that the source should "just give [Barber] the bread too." *Id.* A federal agent explained

that "bread" is "slang" for "[m]oney." *Id.* The source then gave Barber money in exchange for methamphetamine. After the drug deal concluded, the source asked Barber to "tell [Murphy] to let [him] know when the paint comes too," referring to fentanyl. Ex. 519, 03:54–03:57. That statement provided context to Barber's response of "[a]lright." *Id.* at 03:57. Without hearing the source's request, the jury wouldn't have understood what Barber was agreeing to do. Because the confidential source's statements weren't offered for the truth of their contents, they weren't hearsay. That means their admission didn't violate the Confrontation Clause.

### III.

Finally, Barber argues that her sentence is procedurally unreasonable because the district court relied on acquitted conduct in calculating her Guidelines range. A sentence is procedurally unreasonable if the district court incorrectly calculates a defendant's Guidelines range. *Gall v. United States*, 552 U.S. 38, 51 (2007). It didn't do so here.

Ordinarily, we review the procedural reasonableness of a sentence for abuse of discretion. *United States v. Vannelli*, 171 F.4th 912, 917 (6th Cir. 2026). But when a defendant doesn't object before the district court, we review for plain error. *Vonner*, 516 F.3d at 385–86. Here, Barber explicitly disclaimed any argument that the district court's Guidelines calculation relied on acquitted conduct.[1] And when the district court later asked if she had "any procedural reasonableness objection," she responded, "No." R. 386, Pg. ID 5069. So we review this new challenge for plain error.

Barber contends that the district court erred in calculating the amount of drugs attributable to her by incorrectly including "conduct for which [she] was criminally charged and acquitted in federal court." U.S.S.G. § 1B1.3(c). Specifically, Barber notes that she was charged with conspiring to distribute, and distributing, certain drug quantities. But the jury found that her crimes involved lower amounts than those charged: less than 100 grams of heroin, less than 500

---

[1]Barber's explicit concession at sentencing could be considered an "intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (quotation omitted). If so, that would mean she waived any challenge to her sentence on this basis. *See id.* But the government has forfeited any argument that waiver applies here "by failing to raise [waiver] in a timely fashion." *United States v. Boudreau*, 564 F.3d 431, 435 (6th Cir. 2009) (quotation omitted).

grams of cocaine, less than 40 grams of fentanyl, and less than 50 grams but more than 5 grams of methamphetamine. Despite that finding, the district court used the higher drug quantities from the PSR to calculate her Guidelines range. So Barber contends that the district court improperly relied on acquitted conduct.

Even if that's true, Barber still wouldn't be entitled to resentencing. That's because the Guidelines permit district courts to consider conduct that "also establishes, in whole or in part, the instant offense of conviction." *Id.* This is sometimes called "overlapping conduct." *Id.* § 1B1.3 cmt. n.10. Here, the jury convicted Barber of distributing methamphetamine and conspiring to possess with intent to distribute heroin, cocaine, fentanyl, and methamphetamine. So even if the jury acquitted her of the aggravated charges involving the higher drug quantities, the same drugs underlying those greater offenses "establish[], in whole or in part," the lesser-included offenses of conviction. *Id.* § 1B1.3(c). That means § 1B1.3(c) didn't bar the district court from considering the higher drug amounts. As a result, the district court didn't plainly err in calculating Barber's Guidelines range.

\* \* \*

We affirm.

---

## CONCURRENCE

---

THAPAR, Circuit Judge, concurring in part and concurring in the judgment. I fully join the majority's analysis of Tianna Barber's evidentiary challenges. I also agree that the district court didn't err in calculating her Sentencing Guidelines range. But I would reach that conclusion in a far more straightforward way: Under our caselaw, the district court didn't rely on acquitted conduct. I write separately to explain why.

Barber was charged with conspiring to possess with intent to distribute large amounts of controlled substances. But after trial, the jury found that her conspiracy involved far less than the amounts charged—less than 100 grams of heroin, less than 500 grams of cocaine, and less than 50 grams but more than 5 grams of methamphetamine. Nevertheless, in calculating Barber's Guidelines range, the district court concluded that her crimes involved kilograms of those drugs. As a result, Barber claims that the district court relied on acquitted conduct in its calculation. Not so.

An acquittal is "any ruling that the prosecution's proof is insufficient to establish criminal liability for an offense." *Evans v. Michigan*, 568 U.S. 313, 318 (2013). But an acquittal requires a unanimous finding from the jury. *United States v. Golobic*, 170 F.4th 515, 522 (6th Cir. 2026); *see also* Fed. R. Crim. P. 31(a). For example, in *Golobic*, the defendant was convicted of violating the victim's constitutional rights under color of law. 170 F.4th at 518. The verdict form asked the jurors whether Golobic's offense involved kidnapping. *Id.* at 521. The district court instructed the jury to check "yes" if they could reach a unanimous agreement and to check "no" if they couldn't. *Id.* at 521–22. The jury checked "no," but the district court still applied an abduction enhancement at sentencing. *Id.* On appeal, Golobic argued that the district court relied on acquitted conduct in calculating his Guidelines range. *Id.* at 521. We rejected that argument, noting "the response to the interrogatory could merely reflect that a single juror disagreed that kidnapping occurred." *Id.* at 522. Because the jury didn't reach a unanimous decision on the kidnapping, it didn't acquit Golobic of that conduct. *Id.* So too here.

At Barber's trial, the jury never made a unanimous finding about the higher drug weights. As the district court explained in its jury instructions, if the jury found her guilty and even one juror objected to the larger drug quantity, then the jury was required to find the lower amount. The district court reiterated this instruction when the jurors asked a question during deliberations by explaining, "If you are unable to reach unanimous agreement on one or more of the listed controlled substances, I instruct you to select the minimum quantity listed for that controlled substance." R. 315, Pg. ID 2510. So it's possible that 11 of the jurors believed the government had proven the higher drug quantities and just one juror was a holdout. Or maybe the jury was evenly split. Regardless, the jury never reached a unanimous finding that Barber's crimes didn't involve the larger drug amounts. That means the jury didn't acquit her of that conduct. So the district court didn't err in using the higher drug weights to calculate Barber's Guidelines range.

At oral argument, Barber tried to distinguish *Golobic*. She emphasized that the government had charged her with a distinct, aggravated crime by including the higher drug weights. Barber is correct that any fact, like drug quantity, that triggers a mandatory minimum sentence "constitutes an element of a separate, aggravated offense that must be found by the jury." *Alleyne v. United States*, 570 U.S. 99, 115 (2013). But that doesn't change the bottom line here: The jury never unanimously found that Barber didn't commit the "separate, aggravated offense" involving the higher drug weights. *Id.* So it didn't acquit her of that crime.

Barber further notes that the Double Jeopardy Clause would prohibit the government from retrying her on the higher drug weights. According to Barber, this double-jeopardy bar must mean the jury acquitted her of the higher drug quantities. It's true that the Double Jeopardy Clause bars retrial for the same offense following an acquittal. *Jones v. Thomas*, 491 U.S. 376, 381 (1989). But it also forbids the government from retrying an individual for the same offense following a *conviction*. *Id.* And that second rule is what prohibits the government from retrying Barber here.

To determine whether two crimes constitute the same offense within the meaning of the Double Jeopardy Clause, we ask "whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). While the aggravated offense requires proof of an additional fact (the higher drug amounts), the charges for the lower

drug quantities don't require proof of any additional facts. As the Supreme Court has told us, a lesser offense "requires no proof beyond that which is required for conviction of the greater [offense]. The greater offense is therefore by definition the 'same' for purposes of double jeopardy as any lesser offense included in it." *Brown v. Ohio*, 432 U.S. 161, 168 (1977). So it's Barber's *conviction* for the lower drug quantities that precludes retrial for the aggravated offense involving the higher quantities. *See id.* at 169 ("Whatever the sequence may be, the Fifth Amendment forbids successive prosecution and cumulative punishment for a greater and lesser included offense."). In short, the Double Jeopardy Clause bars Barber's retrial because she was convicted of the lesser-included offense, not because she was acquitted of the aggravated charges.[1]

To see why this conclusion makes sense, consider a simple hypothetical. If the jury had been unable to reach a unanimous agreement on both the lesser-included offenses and the aggravated charges, the government certainly could have retried Barber. It's black-letter law that "a retrial following a hung jury does not violate the Double Jeopardy Clause." *Richardson v. United States*, 468 U.S. 317, 324 (1984) (quotation omitted). Based on the jury instructions here, the jury may have been hung on the aggravated charges involving the higher drug weights. So the only difference between Barber's case and the hypothetical is that the jury convicted her of the lesser-included offenses. That conviction now precludes her retrial for the reasons explained above. But it doesn't somehow convert the jury's inability to reach a unanimous agreement on the aggravated charges into an acquittal.

---

[1]Granted, some double-jeopardy cases have suggested that a jury's conviction of a defendant on a lesser-included offense after being "given a full opportunity to return a verdict" on the greater charge constitutes an "implicit acquittal" of the aggravated offense. *Green v. United States*, 355 U.S. 184, 190–91 (1957). But I leave for another day the difficult question of whether the Sentencing Guidelines' definition of acquitted conduct includes implicit acquittals. For starters, the parties haven't fully briefed this issue. What's more, there's reason to doubt whether the jury's verdict here would even constitute an implicit acquittal. In *Green*, the jury found the defendant guilty of second-degree murder, but "[i]ts verdict was silent" on the charge of first-degree murder. *Id.* at 186. So the Supreme Court simply made an "assumption" that the jury acquitted him of first-degree murder. *Id.* at 191. But it might not be reasonable to make such an assumption here given the jury instructions, which required the jury to select the lower drug quantity even if just one juror disagreed with the higher amount.

\*　　\*　　\*

To sum up, the jury never reached a unanimous agreement that Barber's crimes didn't involve the higher drug weights. So it didn't acquit her of those aggravated charges. And that means the district court was permitted to consider the higher drug weights in calculating her Guidelines range. I would affirm for that straightforward reason.